# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ATLANTIC SPECIALTY INSURANCE CO., ET AL. | CIVIL ACTION |
| VERSUS | NO. 17-9318 |
| PHILLIPS 66 CO. | SECTION "L" (1) |

## ORDER AND REASONS

There are five motions before the Court: Phillips 66 Company's Motion for Partial Summary Judgment on La. R.S. 9:2780.1 (R. Doc. 20) and Motion for Partial Summary Judgment on Atlantic Specialty Insurance Company's Duty to Defend (R. Doc. 21); Blanchard Contractors' Motion for Summary Judgment on La. R.S. 9:2780.1 (R. Doc. 32), Atlantic Specialty Insurance Company's Motion for Summary Judgment on Insurance Coverage (R. Doc. 30); and Excess Underwriters' Motion for Summary Judgment (R. Doc. 55). Having considered the parties' briefs and the applicable law, the Court now issues this Order and Reasons.

### I. BACKGROUND

This insurance coverage dispute arises out of a natural gas pipeline explosion. A master services agreement ("MSA") between Blanchard Contractors, Inc. ("Blanchard") and Phillips 66 Company ("P66") governed the work on the pipeline and included a "knock-for-knock" indemnity agreement, whereby Blanchard agreed to indemnify P66 for personal injury claims of Blanchard employees, regardless of fault, and vice versa. The MSA also required Blanchard to procure general liability insurance naming P66 as an additional insured.

Employees of P66 and Blanchard were performing a "pigging" operation on a segment of the pipeline when the explosion occurred. The pipeline was carrying commingled, raw grade

1

natural gas liquid from a gathering facility in Venice, Louisiana to the Enterprise Norco Fractionation Plaint in Norco, Louisiana, where it would be fractionated and processed. R. Doc. 20-3 at 2. Blanchard employees Desmond Calloway and Jacob Jambon sued P66 for personal injuries stemming from the explosion, and P66 demanded defense and indemnity from Blanchard. Blanchard presented P66's claims to its insurer, Atlantic Specialty ("Atlantic"), and Atlantic filed this declaratory judgment suit seeking a declaration that the indemnity and insurance provisions in the MSA are void and unenforceable under the Louisiana Anti-Indemnity Act, La. R.S. 9:2780.1. In response, P66 filed a counterclaim against Atlantic and a third-party demand against Blanchard, seeking a declaration that the indemnity and additional insured provisions of the MSA are valid and enforceable. Finally, Excess Underwriters subscribing severally to Policy No. TMU-407387 ("Excess Underwriters") move for summary judgment that P66 is not an additional insured under their policy and is owed no coverage. R. Doc. 55.

## II. PRESENT MOTIONS

### 1. Applicability of the Louisiana Anti-Indemnity Act

P66 moves for partial summary judgment on its counterclaim and third party demand. P66 asks the Court to issue a judgment (1) declaring that the Louisiana Anti-Indemnity Act does not invalidate the indemnity and insurance provisions in the MSA and (2) dismissing with prejudice Plaintiffs' claims seeking a declaration that the indemnity and insurance provisions are unenforceable.

Blanchard opposes and moves for summary judgment that the Louisiana Anti-Indemnity Act voids any duty to defend or indemnify P66 for personal injury claims of Blanchard employees.

### 2. Atlantic Specialty's Duty to Defend

P66 moves for partial summary judgment that Atlantic owes a duty to defend P66 in the

underlying *Calloway* and *Jambon* suits. Atlantic opposes and moves for summary judgment holding that any duty to defend P66 is void under the Louisiana Anti-Indemnity Act.

### III. LAW AND ANALYSIS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Id.* A party moving for summary judgment bears the initial burden of demonstrating the basis for summary judgment and identifying those portions of the record, discovery, and any affidavits supporting the conclusion that there is no genuine issue of material fact. *Id.* at 323. If the moving party meets that burden, then the nonmoving party must use evidence cognizable under Rule 56 to demonstrate the existence of a genuine issue of material fact. *Id.* at 324.

A genuine issue of material fact exists if a reasonable jury could return a verdict for the nonmoving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1996). "[U]nsubstantiated assertions," "conclusory allegations," and merely colorable factual bases are insufficient to defeat a motion for summary judgment. *See Hopper v. Frank*, 16 F.3d 92, 97 (5th Cir. 1994); *Anderson*, 477 U.S. at 249-50. In ruling on a summary judgment motion, a court may not resolve credibility issues or weigh evidence. *See Int'l Shortstop, Inc. v. Rally's Inc.*, 939 F.2d 1257, 1263 (5th Cir. 1991). Furthermore, a court must assess the evidence, review the facts and draw any appropriate inferences based on the evidence in the light most favorable to the party

opposing summary judgment. *See Daniels v. City of Arlington, Tex.*, 246 F.3d 500, 502 (5th Cir. 2001); *Reid v. State Farm Mut. Auto. Ins. Co.*, 784 F.2d 577, 578 (5th Cir. 1986).

1. **Applicability of the Louisiana Anti-Indemnity Act**

The Louisiana Anti-Indemnity Act ("LAIA) invalidates indemnity and insurance provisions in construction contracts:

> [A]ny provision, clause, covenant, or agreement contained in, collateral to, or affecting a … construction contract which **purports to indemnify, defend, or hold harmless**, or has the effect of indemnifying, defending, or holding harmless, the indemnitee from or against any liability for loss or damage resulting from the negligence or intentional acts or omissions of the indemnitee, an agent or employee of the indemnitee, or a third party over which the indemnitor has no control is contrary to the public policy of this state and is **null, void, and unenforceable**.
>
> [A]ny provision, clause, covenant, or agreement contained in, collateral to, or affecting a … construction contract which **purports to require an indemnitor to procure liability insurance** covering the acts or omissions or both of the indemnitee, its employees or agents, or the acts or omissions of a third party over whom the indemnitor has no control is **null, void, and unenforceable**.

LA. REV. STAT. § 2780.1 (emphasis added).

"Construction contract" is defined as:

> Any agreement for the design, construction, alteration, renovation, repair, or maintenance of a building, structure, highway, road, bridge, water line, sewer line, oil line, **gas line**, appurtenance, or other improvement to real property[.]

LA. REV. STAT. § 2780.1(A)(2)(a) (emphasis added).

P66 first argues that the MSA does not fit within this definition because it governed work on a "hazardous liquids" pipeline, not a "gas" pipeline. P66 makes this argument despite initially referring to the pipeline as a "gas" line – R. Doc. 20-3 at 2 ("Employees of P66 and Blanchard were performing a pigging operation on a segment of a natural gas liquid pipeline"); R. Doc. 20-3 at 11 ("It is undisputed that the work being performed on the Pipeline occurred at a point after gas was comingled"); R. Doc. 4 at 17 ("The *Calloway* suit alleges various causes of action against Phillips 66 for bodily injury sustained by Desmond Calloway while performing maintenance on

4

the natural-gas pipeline") – and later arguing that the pipeline is removed from the scope of LAIA under the exception for gas gathering lines and oil flow lines carrying commingled gas. The pipeline is a "gas line" under the ordinary meaning of the term and, in any event, qualifies as a "structure" or "improvement to real property."

P66 next argues that the MSA is removed from the scope of LAIA by two of its provisions. The first is Subpart (E):

> The provisions of this Section are not intended to, nor shall they be judicially interpreted, to alter, add to, subtract from, amend, overlap, or affect the provisions of [the Louisiana Oilfield Anti-Indemnity Act].

LA. REV. STAT. § 2780.1(E).

The Louisiana Oilfield Anti-Indemnity Act (LOAIA) voids indemnity and insurance provisions in contracts that "pertain to a well." Its applicability is determined under a two-part test:

> First, there must be an agreement that "pertains to" an oil, gas or water well. If the contract does not pertain to a well, the inquiry ends. Only if we determine that the contract has the required nexus to a well may we proceed to the second step of the process, examination of the contract's involvement with "operations related to the exploration, development, production, or transportation of oil, gas, or water." … Therefore, if (but only if) the agreement (1) pertains to a well, and (2) is related to exploration, development, production, or transportation of oil, gas, or water, will the Act invalidate any indemnity provision contained in or collateral to that agreement.

*Transcon. Gas Pipe Line Corp. v. Transportation Ins. Co.*, 953 F.2d 985, 991 (5th Cir. 1992).

As the Fifth Circuit has recognized, "the legislature intended [LOAIA] to apply if (but only if) an agreement pertains to a well." *Id.* A contract does not "pertain to a well" – and is not subject to LOAIA's indemnity prohibition – if it pertains to gas that "can no longer be identified with a particular well" or gas that has become "so fundamentally changed [by] processing, commingling, or preparing it for distribution to its ultimate end user" that it cannot be attributed to a particular

5

well. *Id.* at 994. LOAIA thus does not invalidate indemnity provisions in contracts that pertain to pipelines past the point of commingling. *See Johnson v. Amoco Production Co.*, 5 F.3d 949 (5th Cir. 2002).

It is undisputed that the MSA involved in this case covered work on a pipeline past the point of commingling – so the MSA did *not* "pertain to a well" and is not within LOAIA's anti-indemnity scope. To hold that LAIA invalidates the indemnity provisions of the MSA that are not invalidated by LOAIA, P66 argues, would impermissibly "add to" the scope of LOAIA. But where, as here, a contract does not "pertain to a well" and is never within the scope of LOAIA, it is not altered or overlapped by the application of LAIA, a separate anti-indemnity statute governing a different and broader class of contracts.

P66 next argues that the MSA falls within LAIA's "co-mingled for transportation" exception to the definition of construction contract:

> "Construction contract" shall not include any design, construction, alteration, renovation, repair, or maintenance of … [o]il flow lines or **gas gathering lines** used in association with the transportation of production **from oil and gas wells from the point that oil and gas becomes co-mingled for transportation** to oil storage facilities or gas transmission lines.

LA. REV. STAT. § 2780.1(A)(2)(b)(ii).

P66 contends that this exception is not limited to "gathering" lines, but that it "begins in the gathering lines and continues through the transportation process" – such that any pipeline carrying commingled gas is exempt. This interpretation, though, runs contrary to the plain text of the statute and principles of statutory interpretation. "Courts should give effect to all parts of a statute and should not adopt a statutory construction that makes any part superfluous or meaningless," and must presume that "every word, sentence, or provision in a statute was intended to serve some useful purpose, that some effect be given to each such provision, and that the

6

Legislature used no unnecessary words or provisions." *Sultana Corp. v. Jewelers Mut. Ins. Co.*, 03-0369, p. 7 (La. 12/3/03); 860 So.2d 1112, 1117. "When a law is clear and unambiguous and its application does not lead to absurd consequences, the law should be applied as written and no further interpretation may be made in search of the intent of the legislature." La. Civ. Code art. 9

LAIA first states that it applies to contracts for the "design, construction, alteration, renovation, repair, or maintenance" of "oil lines" and "gas lines." LA. REV. STAT. § 2780.1(A)(2)(a). It then carves out an exemption for "oil flow lines" and "gas gathering lines" carrying commingled oil or gas. LA. REV. STAT. § 2780.1(A)(2)(b)(ii). Under the clear statutory language, Subpart (A)(2)(b)(ii)'s "co-mingled for transportation" exception applies only to oil flow lines and gas gathering lines.

The MSA thus falls within the scope of LAIA unless the pipeline was a "gas gathering" line. P66 argues there is a material question of fact as to whether the pipeline was a "gathering" line or was functioning in a "gathering" capacity, since it was transporting gas to a further downstream processing facility. Blanchard responds that it cannot be a gathering line because it is a post-processing pipeline.

LAIA does not define "gathering line." The Code of Federal Regulations, however, defines gathering line as line as "a pipeline that transports gas from a current production facility to a transmission line or main." 49 C.F.R. § 192.3. Although "current production facility" "is not defined in the regulations, it appears to mean 'gas well.'" *Hamman v. Sw. Gas Pipeline, Inc.*, 721 F.2d 140, 143 (5th Cir. 1983), *see also* United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration, https://primis.phmsa.dot.gov/comm/glossary/index.htm?nocache=1340#GatheringLine ("Gathering lines are pipelines that transport oil or natural gas from the wellhead to a transmission

line").[1]

This pipeline was transporting unfractionated raw grade natural gas liquids from a natural gas gathering facility in Venice, Louisiana to the Shell Enterprise Norco facility, where it would be fractionated and processed. R. Doc. 20-4 at 2. The Venice plant is the initial processing facility. ("[T]he first processing facility on the left would be the VESCO plant out in Venice. And then what our pipeline was doing was simply taking that raw make pass through from the VESCO and sending it all over to Shell Norco, but Shell Norco was going to be processed and fractionated."). The pipeline involved here is a post-processing pipeline, and because it did not come from a "current production facility," it is not a gas gathering line.[2]

## 2. Atlantic Specialty's Duty to Defend

Under the Atlantic Policy (the "Policy") issued to Blanchard, Atlantic agreed to defend an "insured" against any suit seeking damages for bodily injury to which the Policy applies. "Insured"

---

[1] *See also Gathering Pipelines FAQs*, United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration (updated Aug. 20, 2018), https://www.phmsa.dot.gov/faqs/gathering-pipelines-faqs (Gathering pipelines transport gases and liquids from the commodity's source – like rock formations located far below the drilling site – to a processing facility, refinery or a transmission line"); *Fact Sheet: Gathering Pipelines*, United States Department of Transportation, Pipeline and Hazardous Materials Safety Administration (revised November 22, 2018), https://primis.phmsa.dot.gov/comm/FactSheets/FSGatheringPipelines.htm ("Plainly speaking, gathering lines are those pipelines that are used to transport crude oil or natural gas from the production site (wellhead) to a central collection point. They generally operate at relatively low pressures and flow, and are smaller in diameter than transmission lines.")

[2] The Code of Federal Regulations also instructs operators to use the API Recommended Practice 80 ("RP 80) to determine whether a pipeline meets the "gathering line" definition. RP 80 generally defines a "gathering line" as a pipeline that transports gas from "the furthermost downstream point in a production operation to the furthermost downstream" point of the gathering operation, which can be a gas processing plant, gas treatment facility, gas gathering compressor, point of commingling of gas from two or more fields, or point of connection of the gathering line to another pipeline." RP 80 § 2.2.1.2. The Code of Federal Regulations 'provides three limitations on these endpoints: (1) the endpoint may not extend beyond the first processing plant; (2) the point of commingling of gas may not be from fields more than 50 miles from one another; and (3) the endpoint may not extend beyond the furthermost downstream compressor used to increase pressure." James Curry, *What Producers Need to Know About the Pipeline and Hazardous Materials Safety Administration and the Federal Energy Regulatory Commission – Jurisdiction and Changes Ahead*, Rocky Mountain Mineral Law Foundation Special Institute, 2018; 49 C.F.R. § 192.8. *See also* 43 La. Admin. Code Pt. XIIII, 508 ("The endpoint of gathering, under Section 2.2(a)(1)(A) of API RP 80, may not extend beyond the first downstream natural gas processing plant, unless the operator can demonstrate, using sound engineering principles, that gathering extends to a further downstream processing plant").

includes any organization Blanchard is obligated by an "insured contract" to include as an additional insured with respect to liability arising out of Blanchard's work. R. Doc. 21-7 at 32 "Insured contact" includes an agreement pertaining to Blanchard's business in which Blanchard assumes the tort liability of another party. *Id.* at 26. Because the MSA (1) required Blanchard to obtain general commercial liability insurance including P66 as an additional insured and (2) required Blanchard to assume P66's liability for suits arising out of personal injury of Blanchard employees in connection with a service order; and (3) a suit was commenced against P66 for bodily injury arising out of Blanchard's work, P66 argues that Atlantic owes a duty to defend. Atlantic opposes and moves for summary judgment holding that LAIA voids any duty to defend or indemnify P66.

P66 is correct to note that an insurer's duty to defend is separate from – and broader than – its duty to indemnify. LAIA, however, voids any duty of Atlantic to indemnify or defend P66 in the *Calloway* and *Jambon* suits as a matter of law:

> [A]ny provision, clause, covenant, or agreement contained in, **collateral to**, or affecting a … construction contract which **purports to indemnify, defend, or hold harmless**, or has the effect of indemnifying, defending, or holding harmless, the indemnitee from or against any liability for loss or damage resulting from the negligence or intentional acts or omissions of the indemnitee, an agent or employee of the indemnitee, or a third party over which the indemnitor has no control is contrary to the public policy of this state and is **null, void, and unenforceable**.
>
> [A]ny provision, clause, covenant, or agreement contained in, collateral to, or affecting a … construction contract which **purports to require an indemnitor to procure liability insurance** covering the acts or omissions or both of the indemnitee, its employees or agents, or the acts or omissions of a third party over whom the indemnitor has no control is **null, void, and unenforceable**.

LA. REV. STAT. § 2780.1 (emphasis added); *see also Aucoin v. Pelham Marine, Inc.*, 593 F. Supp. 770, 776 (W.D. La. 1984) ("[LOAIA] not only declares null and void indemnity provisions, but also any obligation of Champion and its insurer to defend Chevron").

9

Section I of LAIA does provide an exception to LAIA's indemnity and insurance prohibition:

> Nothing in this Section shall invalidate or prohibit the enforcement of the following:
>
> (1) Any clause in a construction contract containing the indemnitor's promise to indemnify, defend, or hold harmless the indemnitee or an agent or employee of the indemnitee if the contract also requires the indemnitor to obtain insurance to insure the obligation to indemnify, defend, or hold harmless and there is **evidence that the indemnitor recovered the cost of the required insurance in the contract price**. However, the indemnitor's liability under such clause shall be limited to the amount of the proceeds that were payable under the insurance policy or policies that the indemnitor was required to obtain.
>
> (2) Any clause in a construction contract that requires the indemnitor to procure insurance or name the indemnitee as an additional insured on the indemnitor's policy of insurance, but only to the extent that such additional insurance coverage provides coverage for liability due to an obligation to indemnify, defend, or hold harmless authorized to Paragraph (1) of this Subsection, provided that such insurance coverage is provided only when the indemnitor is at least partially at fault or otherwise liable for damages ex delicto or quasi ex delicto.

Section I thus allows indemnity and insurance provisions in construction contracts if (1) the contract requires that the indemnitor obtain insurance to insure its obligation to indemnify, defend, or hold harmless and (2) there is "evidence that the indemnitor recovered the cost of the required insurance in the contract price." LA. REV. STAT. § 2780.1(I). And if those provisions are met, the indemnitor's liability is "limited to the amount of the proceeds that were payable under the insurance policy or policies that the indemnitor was required to obtain." *Id.* Paragraph (2) allows additional insured provisions that are "authorized pursuant to Paragraph (1)" and the indemnitor is at least partially at fault.

Here, the MSA requires Blanchard to maintain insurance "at its expense." R. Doc. 21-5 at 30, and it is undisputed that P66 "at no point paid extra premium to be named as additional insured under Blanchard's policy." R. Doc. 34-1. Accordingly, the exception does not apply, and LAIA

10

voids any duty to defend or indemnify P66 in the *Calloway* and *Jambon* suits.

## IV.     CONCLUSION

For these reasons, LAIA voids any duty of Blanchard or Atlantic to defend or indemnify P66 in the *Calloway* and *Jambon* suits. Accordingly, P66's motion for partial summary judgment that LAIA does not apply, R. Doc. 20, and motion for partial summary judgment on Atlantic's duty to defend, R. Doc. 21, are hereby **DENIED**. Blanchard's motion for summary judgment on LAIA, R. Doc. 32, Atlantic's motion for summary judgment on the duty to defend, R. Doc. 30, and Excess Underwriters' motion for summary judgment that P66 is not owed coverage, R. Doc. 55, are **GRANTED**.

New Orleans, Louisiana, this 5th day of February, 2019.

_____
**ELDON E. FALLON**
UNITED STATES DISTRICT JUDGE